**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 92-7728
_____

ROD GRABOWSKI,

Plaintiff-Appellant,


versus

JACKSON COUNTY PUBLIC DEFENDERS OFFICE, ET AL.,

Defendants-Appellees.

CONSOLIDATED WITH

_____

No. 94-60089
_____

RODERICK J. GRABOWSKI,

Petitioner-Appellant.


versus

EDWARD HARGETT, Superintendent,
Mississippi State Penitentiary, et al.,

Respondent-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____
(March 6, 1995)

Before POLITZ, Chief Judge, SMITH, Circuit Judge and BERRIGAN,
District Judge.[*]

GINGER BERRIGAN, District Judge:

Roderick J. Grabowski has appealed the denial of his 28 U.S.C.

§2254 petition for writ of habeas corpus, challenging the

_____
[*] District Judge of the Eastern District of Louisiana, sitting by
designation.

legality of his conviction, and the denial of his 42 U.S.C. §1983 prisoner complaint, challenging various aspects of his confinement as a pretrial detainee.  For the reasons set forth below, we AFFIRM the dismissal of the habeas corpus petition. With respect to the prisoner complaint, we REMAND to the trial court for further consideration of the allegation regarding Grabowski's placement in a cellblock of predominantly black inmates and we AFFIRM the dismissal of the remainder of the petition.

I.   The Habeas Corpus Petition, 28 U.S.C. §2254

Facts and Proceedings

On December 15, 1988, Roderick Grabowski was arrested in Harrison County, Mississippi and charged with armed robbery and burglary/larceny of a dwelling.  He was later indicted on both charges and initially pled not guilty.  He moved to suppress various items seized from his car but the motion was denied.  On the day of trial, the armed robbery charge was reduced to robbery and Grabowski pled guilty to robbery and burglary.  Pursuant to the plea bargain, the prosecution recommended a sentence of fifteen years for the robbery and ten years, concurrently, for burglary.  This was the sentence imposed.

Grabowski filed a pro se application for post-conviction relief. After exhausting state remedies, he filed a Petition for Writ of Habeas Corpus in the United States District Court under 28 U.S.C.

§2254.  He made the following allegations:

1.    His guilty plea was induced by coercion.

2.    He did not receive the effective assistance of counsel.

3.    His arrest and the search of his car were illegal.

4.    His convictions violated double jeopardy.

On January 31, 1994, the District Court denied his petition.


The Guilty Plea

Grabowski challenges the legality of his guilty plea, claiming it was coerced.  He alleges that the prosecution threatened to seek an habitual offender bill against him which could result in a mandatory 30 year sentence if he didn't agree to the proposed plea bargain.  Grabowski argues that his prior criminal record was in fact insufficient to justify such a sentence, and therefore he was coerced into pleading guilty by erroneously based threats.[1]

On the trial date, Grabowski's public defender moved to withdraw from the case and for a continuance because of a possible

_____

[1]  Grabowski also alleged that the prosecution agreed to dismiss the armed robbery count at the preliminary hearing if he waived the hearing as to the burglary/larceny count.  The prosecution then obtained an indictment for armed robbery which he claims deprived him of the chance to disprove robbery at the preliminary hearing.  The District Court did not deal with this particular issue, but even if it were true, we fail to see how it affects the validity of his guilty plea.

3

conflict of interest.[2]  At that point, the prosecutor stated:

> The State is ready for trial and its witnesses are
> here, its evidence here on Mr. Grabowski and Mrs.
> Christianson.  The State is ready to move forward.  I
> would advise the Court in all sincerity that since the
> indictment in February of 1989 of Mr. Grabowski the
> State has learned that he has at least five prior
> felony convictions.  If there is a continuance today
> this is not a threat by any means to Mr. Grabowski or
> this Court.  The State is going to bring in the Grand
> Jury, nolle pros his cases and reindict Mr. Grabowski
> as perhaps a life habitual offender.  I just want all
> the cards on the table.

The trial court denied the motion to withdraw.  Grabowski then

pled guilty pursuant to the plea bargain.

The District Court correctly found Grabowski's guilty plea to be

free and voluntary and not the result of coercion.  To be valid,

a guilty plea must be knowingly, intelligently and voluntarily

entered.  The defendant must be shown to understand the nature of

the charges and the consequences of the plea.  Boykin v. Alabama,

395 U.S. 238 (1969); Hobbs v. Blackburn, 752 F.2d 1079 (5th Cir.

1985); Diaz v. Martin, 718 F.2d 1372 (5th Cir. 1983).

The guilty plea proceeding in this case was detailed and

painstaking.  Grabowski acknowledged his understanding of the

charges, the consequences of the plea and his constitutional

rights.  The plea agreement was discussed, including the

recommendation of the prosecution for concurrent fifteen and ten

---

[2]  Grabowski had filed a suit against the Public Defender's
Office after a dispute with their paralegal resulted in
revocation of some of his visitation privileges at the jail.

year sentences.  Grabowski himself provided the factual basis for the charge by explaining what he had done.  The record indicates the plea was knowingly and voluntarily entered.[3]

Of course, a guilty plea is invalid if it is produced "by actual or threatened physical harm or by mental coercion overbearing the will of the defendant."  Brady v. United States, 397 U.S. 742, 750, 90 S.Ct. 1463, 1470 (1970).  Not all pressures to plead, however, are considered illegal inducements.  Threatening harsher penalties, including indictment as an habitual offender, is a legitimate negotiating tactic in the give and take of plea bargaining.  Brady v. United States, supra; Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed 2d 604 (19798).  As long as the prosecution has probable cause to believe the defendant is guilty of the allegation being made, the decision of whether or not to so prosecute is within its discretion. Bordenkircher v. Hayes, supra.  The District Court correctly found that Grabowski's prior criminal record, which included by his own admission, felony convictions in three different states, justified a probable cause conclusion that he could be charged as a habitual offender under Mississippi law.  Finally, Grabowski was specifically asked if his plea was induced by promises or coerced by threats and he answered no.

---

[3]  Grabowski also alleged that the guilty plea form and the transcript of the proceedings had been altered.  No evidence was presented to support that allegation other than his self-serving declaration.  Webster v. Estelle, 505 F.2d 9226 (5th Cir. 1974), cert. denied, 421 U.S. 918 (1975).

5

The guilty plea was validly entered.


Ineffective Assistance of Counsel

Grabowski alleges his appointed counsel was ineffective.  In
order to succeed on an ineffectiveness claim, a petitioner must
establish (1) that counsel's performance was deficient in that it
fell below an objective standard of reasonable professional
services, and (2) that this deficient performance prejudiced the
defense such that there is a reasonable probability that the
outcome of the trial has been undermined and the result would
have been different.  Strickland v. Washington, 466 U.S. 668, 104
S. Ct. 2052, 80 L.Ed.2d 674 (1984).


The District Court correctly noted that Grabowski received
substantial benefits with his plea bargain.  One charge was
reduced[4] and he received concurrent sentences.  He also avoided
entirely being prosecuted as an habitual offender, despite having
a number of prior convictions.


The crux of Grabowski's complaint is that (a) his counsel
misinformed him that he was subject to an habitual offender life
sentence if he refused the plea bargain; and (b) his counsel had
a conflict of interest since Grabowski had sued the Public
Defender's Office, which employed the attorney.  As already

---

[4]  The reduction of armed robbery to robbery apparently
favorably affected Grabowski's eligibility for early release.

6

noted, the District Court correctly found that the prosecutor's threat to seek a possible indictment against Grabowski as a habitual offender was not factually erroneous nor was it improper coercion.  Consequently, trial counsel was not delinquent in warning Grabowski of that possibility.  With regard to the law suit, Grabowski's attorney did attempt to withdraw as counsel because of the law suit, which motion was denied.[5]   At the Boykin hearing, the trial court carefully questioned Grabowski regarding the suit and its impact on the plea.   Grabowski stated clearly that he considered his counsel to be a good lawyer, that the law suit had to do with other staff, not the attorney, and that he was satisfied with the representation.  Likewise, the record indicates no relationship, much less an adverse one, between Grabowski's complaints in his lawsuit and the competency of his attorney at the guilty plea proceedings.

Trial counsel was not ineffective.

Arrest Without A Warrant

Grabowski complains that he was arrested without probable cause and his car was illegally searched in violation of the Fourth Amendment.  Items allegedly stolen in a burglary were found in the trunk.

---

[5]  The motion was denied mainly because the trial court was unable to confirm that the suit had actually been filed.  As it turns out, it had been.  In any event, trial counsel had been made aware of it by Grabowski prior to the plea.

7

The District Court correctly concluded that these claims were waived by Grabowski's plea of guilty. A knowing and voluntary plea of guilty waives all preceding nonjurisdictional defects, including Fourth Amendment claims. United States v. Diaz, 733 F.2d 371, 376 n. 2 (5th Cir. 1984); Williams v. Wainwright, 604 F.2d 404, 406-07 (5th Cir. 1979); Ortega-Velasquez v. United States, 465 F.2d 419 (5th Cir. 1972).

Grabowski was also specifically advised at the guilty plea hearing that his plea would require him to surrender any allegations of illegal arrest, search or seizure:

> Q. There could be other constitutional rights such as illegal arrest and illegal search and seizure and a lot of others; even though, I have not specifically mentioned these other constitutional rights or gone over them (in) detail with you, if I accept your plea of guilty this morning, you, in fact, waive or give up all of your constitutional rights insofar as they apply to these two indictments and these two crimes; do you understand that?
>
> A. Yes, Your Honor.
> (Record, Vol. 1, p. 217)

Grabowski alleges that his attorney told him he could raise this issue, post-conviction, despite the guilty plea. That claim is negated by Grabowski's own words at the guilty plea hearing. Additionally, his trial attorney, in an affidavit, sates emphatically that "(a)t no time" did he tell Grabowski that he could successfully attack his conviction through post-conviction

8

relief once he accepted the plea bargain.[6]

The claim is without merit.

Double Jeopardy

Finally, Grabowski alleges his convictions violate double jeopardy because the evidence and elements of the crime of burglary/larceny are the same as the crime of robbery.

The District Court correctly found no double jeopardy violation. The test for double jeopardy is whether each offense requires proof of an additional fact which the other does not. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Under Mississippi law, the offenses of burglary and robbery consist of different elements. Burney v. State, 515 So.2d 1154 (Miss. 1987); Wright v. States, 540 So.2d 1 (Miss. 1989); Miss. Code Ann. Sect. 97-3-73 (1972).

---

[6] Finally, even if this Court were to consider the underlying claim, it has no merit. The same day as the offense, a description of the vehicle and the perpetrators was broadcast over the police radio. That same day, an officer on patrol heard the bulletin and stopped Grabowski because he matched the description. Grabowski alleges that the officer stopped him on a police bulletin that was several weeks old regarding another offense. The officer heard both bulletins and recognized the descriptions as being similar. He stopped Grabowski for both reasons. The stop was supported by probable cause. Likewise, the search of the car was legal. The officer testified that he saw in plain view inside the car various items that matched items taken in the earlier burglary. An at-the-scene inventory search was made of the trunk, where additional items were found that had allegedly been stolen.

9

There was no double jeopardy violation.

Conclusion

The District Court correctly rejected Grabowski's various allegations regarding the validity of his conviction. The petition for habeas corpus relief was properly denied.

II.  The Prisoner Civil Rights Complaint, 42 U.S.C. §1983

Facts and Proceedings

In May, 1989, plaintiff Grabowski filed a pro se 42 U.S.C. §1983 law suit alleging various constitutional deprivations while he was imprisoned as a pretrial detainee at the Adult Detention Center (ADC), Jackson County, Mississippi.  In June, 1990, the District Court dismissed the petition on the basis that it failed to state a cause of action.  On appeal, we upheld the dismissal as to some of the claims but remanded three to the District Court for adjudication on the merits[7]:

(1) The allegation that Grabowski's visitation privileges were revoked without a hearing and as punishment;

(2) The allegation that Grabowski was denied telephone and recreation privileges without a hearing while in protective custody and this likewise was done as punishment;

(3) The allegation that Grabowski was used by the prison authorities to discipline black inmates, that the authorities made this known throughout the prison and then subsequently

_____

[7] #90-1500, Summary Calendar, January 19, 1991

10

placed him in a cell with predominantly black inmates.

On October 9, 1991, an evidentiary hearing was held on Grabowski's complaint.  The Magistrate Judge recommended denial of the petition.  The District Court made a de novo review of the record and likewise denied the petition.

In order to frame Grabowski's issues on appeal in a coherent fashion, we will use the following factual chronology:

> 2/89 Grabowski arrives at the Adult Detention Center (ADC), charged with felony offenses; he is placed in Cell HE, a unit for pretrial detainees;
>
> 2/24/89 Major Robert McIlrath, ADC Director, approves Grabowski for special in-house visitation with his co-defendant girlfriend who is also incarcerated at ADC;
>
> 2/27/89 Wendell Poole, a black inmate, is transferred into the HE area after causing trouble in another unit. Grabowski alleges that Officer Brian Grady told him that the classification officer, Vera Simmons, sent Poole to Grabowski so that Grabowski could "take care" of him;
>
> 3/6/89 Classification officer, Vera Simmons, receives word by telephone that there is a hold from Florida on Grabowski for a probation/parole violation;
>
> 3/9/89 Grabowski is visited by a paralegal from the public defender's office, Jennifer Garaway.  He argues with her and in a loud voice in the presence of other inmates, mostly black, he calls her a "nigger bitch";
>
> Between 3/9 & 3/14/89 Major McIlrath revokes Grabowski's in-house visitation due to the incident with Garaway; no hearing is held prior to revocation;
>
> 3/20/89  Simmons receives written, but unofficial, verification of the Florida hold;
>
> 3/21/89 Grabowski is transferred to AE, a medical unit, because he needs a metal brace on his knee;  AE houses both pretrial detainees and post-conviction inmates;

<u>3/27/89</u> A routine search of the area where Grabowski is housed uncovers tools and other evidence of a possible escape attempt; Grabowski is moved to BE which is a lockdown isolation cell;

<u>4/3/89</u> Grabowski is moved from BE to KE unit which houses post-conviction prisoners and is predominantly black; the prison officials claim the move occurred because of the probation hold from Florida, indicating he is not pretrial but post-conviction;

<u>Between 4/3 & 4/6/89</u> Grabowski claims he is attached and beaten by three black inmates in KE; their stated motivation in assaulting him is his altercation with the paralegal Garaway, his supposed threat to take care of Wendell Poole and his racial prejudice;

<u>4/6/89</u> A fire is set in Grabowski's cell; when the officials arrive, Grabowski has a heated argument with a black inmate; Grabowski is moved to protective custody; he is also taken to the nurse.  In protective custody, where he remains about eleven days, Grabowski has either limited or no access to the telephone and recreation.

To obtain relief under 42 §1983, a prisoner must prove two elements: (1) a deprivation of a right secured by the Constitution and laws of the United States, and (2) a deprivation of that right by the defendant acting under color of state law.


<u>Loss of In-House Visitation</u>

Grabowski alleges his constitutional rights were violated when his in-house visiting privileges with his imprisoned girlfriend were rescinded after the incident with paralegal Jennifer Garaway.  The privileges were revoked without a hearing and Grabowski claims it was done as punishment.


In <u>Bell v. Wolfish</u>, 441 U.S. 520, 99 s.Ct. 1861, 60 L.Ed.2d 447 (1979), the United Sates Supreme Court set forth the standards

12

for evaluating the constitutional rights of pretrial detainees. Since they are presumed innocent, they cannot be "punished" while in custody. Consequently, the Eighth Amendment standards allowing "punishment" (as long as it is not cruel and unusual) do not apply. Pretrial detainees are, however, subject to restrictions on their liberty insofar as those are necessary for maintenance and security of the jail. This curtailment on liberty must nonetheless comply with due process of law. The test is whether the particular restriction is reasonably related to a legitimate prison objective, other than punishment. If it is, then no right is violated.

In Block v. Rutherford, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984), the United States Supreme Court upheld a blanket prohibition against contact visitation for pretrial detainees at the Los Angeles County Central Jail. The Court found the restriction was reasonably related to the legitimate objective of maintaining internal security at the jail.

At the evidentiary hearing, it was established that Grabowski's in-house visitation was a special accommodation made by the prison at the request of the Public Defender's Office. Grabowski's girlfriend was pregnant and had no outside visitors. The privileges were revoked after Grabowski engaged in a shouting match with a paralegal from the Public Defender's Office in the

13

presence of other inmates, mostly black, during which Grabowski called the paralegal a "nigger bitch."  Major Robert McIlrath testified that the incident upset the other inmates and that Grabowski's conduct was not conducive to having the special in-house visitation.

The District Court correctly concluded that Grabowski's due process rights were not violated by the revocation of his in-house visitation privileges.  The privilege had been a special accommodation to begin with, as opposed to a right to which Grabowski was entitled.  Furthermore, the privilege was rescinded, not as punishment per se, but as a necessary action reasonably related to the maintenance of prison security and order.

Denial of Telephone/Recreation Privileges in Protective Custody
Grabowski also complains that when he was placed in protective custody, after the alleged beating in KE, he was denied telephone, recreation and canteen privileges without a hearing and as punishment for his prior conduct.  The District Court correctly found this claim to be meritless.  The hearing disclosed no evidence that Grabowski was being punished while in protective custody; on the contrary, the placement was for his own safety.  At most, the evidence indicated that that area of the facility lacked a telephone jack so inmates had to be brought to the booking area at the discretion of the shift lieutenant.

14

Recreation was also apparently subject to the same personnel constraints. No punishment or arbitrary deprivation of privilege was established.

The Place in KE Cell and the Assault

When we remanded this particular issue for adjudication on the merits, our concern was specific. Grabowski alleged that the officials at the prison had used him as a tool to discipline unruly black prisoners, made this use known throughout the prison and subsequently placed him in a cell of predominantly black inmates. We suggested that these allegations, if proven, could be sufficient to establish a callous indifference to Grabowski's safety.

The evidentiary hearing dispelled those particular concerns. No evidence was presented, other than Grabowski's own self-serving testimony and lukewarm corroboration by a fellow inmate, Wendell Poole[8], that Grabowski was used to discipline inmates, much less that that use was made known throughout the prison. The pertinent officials involved, Vera Simmons and Brian Grady, testified and refuted any such plan or intention. The District

---

[8] Poole is a black inmate. He testified that he was transferred into Grabowski's cellblock after causing trouble in his other unit. He stated that when he was brought into the cell area, Officer Brian Grady told Grabowski to "take care" of him (Poole). Poole said he understood this to mean that Grabowski was to jump him or stop him from making trouble. Poole also testified he had no problems with Grabowski. Both Officer Grady and Vera Simmons denied that any such statement was made or instruction given.

Court was correct in denying relief as to that basis.[9]

While those particular allegations were disposed of on remand, the testimony of the prison officials disclosed a disturbing awareness nonetheless of very real racial tension between Grabowski and the black inmate population just a few weeks prior to the transfer.  This awareness coupled with other circumstances of the transfer causes us concern.

It is undisputed that on March 9, 1989, Grabowski had a loud and heated argument with paralegal Jennifer Garaway in the dayroom of the cellblock with a number of black inmates present.  It is also undisputed that at the end of the altercation, he called her a "nigger bitch."  When Grabowski lost his in-house visiting privileges because of the incident, he complained to Vera Simmons.  She wrote a note in response, which was admitted into evidence.  It said in part:

> You were advised (sic) by us to behave while you are in our facility and we would allow visits.  You don't have to call people <u>nigger bitch</u> to get their attention.

---

[9]  Grabowski raises other meritless issues in his appeal brief.  He complains that he was not in fact attempting to escape while housed in the medical unit, and he was therefore improperly punished for it.  This complaint is beyond the scope of our remand to the district court and nonetheless is without merit.  Grabowski does not dispute that the escape tools were found in his living unit.  Furthermore, he pled guilty to the disciplinary violation, acknowledging that while he didn't intend to escape himself, he was aware of the planned attempt and did not report it.  Grabowski also complains that the Magistrate Judge limited the number of witnesses he could call.  In fact, the judge allowed for additional witnesses but Grabowski did not have addresses for them.

Major McIlrath, who had allowed the special visits, rescinded

them after the incident.  At the evidentiary hearing, he said he

revoked them because of Grabowski's "conduct."

> Court:  Go into some detail as to what you're talking
> about.  You say "conduct."  What conduct are you
> talking about?
>
> McIlrath:  Yelling, carrying on, back in the hall.  As
> I recall, the incident that he's referring to with Ms.
> Garaway happened on a day when the whole day room was
> out for recreation.  At the time the day room was being
> brought back in and there was traffic in the halls, he
> got into some kind of hassle with Ms. Garaway.  At the
> time there was probably 13, 14, maybe 15 blacks, two or
> three white.  there got to be some hassling going back
> and forth.  What he done was, at that point, not what
> he was having a problem with Ms. Garaway, but he was
> causing a disturbance in the hallways which was causing
> an uproar in the other day rooms and, in my opinion,
> what he did there in causing them other inmates to get
> upset and causing problems there was not the type of an
> action that I would give special privileges to someone
> for.
>
> Court:  So it arose out of the Garaway incident, is
> that right, the elimination of this special privilege?
>
> McIlrath:  Yes, sir, I--yeah.  From the actions that he
> took, yeah.
>
> Court:  All right.
>
> Grabowski:  Okay.  You said that 14, 15, 16, I can't
> remember that number, but you said a multitude of
> people were raving.  I'm not the only one that was
> complaining then, was I?
>
> McIlrath:  I know of no one else complaining.  I know
> that people got upset.
>
> Grabowski:  Do you know why they got upset?
>
> McIlrath:  I had an idea.
>
> Grabowski:  What was your idea?
>
> McIlrath:  My idea was that there was quite a flew
> blacks there that was upset over the way you were
> talking to Jennifer or whatever it was.  I don't know.

Vera Simmons nonetheless testified that she didn't recall having any reason to believe Grabowski would have problems when she placed him in a cell with predominantly black inmates.

This placement concerns us also because of its timing. Simmons claimed she made the transfer into KE because she has received written verification on March 20 that Florida had a hold on Grabowski, so she considered him eligible for a post-conviction unit. However, she had received verbal notification of Grabowski's status several weeks earlier (prior to the Garaway incident) and did not move him[10]. She also acknowledged that the written confirmation of March 20 lacked the necessary documentation to be official.

At the time Simmons received this written notice, Grabowski was in the medical unit. On March 27, he was transferred into isolation because escape tools were found in his living area, an incident which certainly must have displeased the jail authorities. On April 3, Grabowski had a disciplinary hearing before Vera Simmons. He pled guilty to the infraction and was that day transferred by her into the predominantly black post-conviction unit where he allegedly was attacked and beaten.

We are sympathetic to the difficult task jail administrators face

---

[10] Simmons testified that she didn't move him earlier because of "overcrowding" and also because they had not received the written verification of the Florida hold.

18

in operating their facilities.  We recognize that they must deal on a day-to-day basis with the often difficult individuals, forced to live in close quarters 24 hours a day.  "(A) federal court should not, under the guise of enforcing constitutional standards, assume the superintendence of jail administration." Alberti v. Klevenhagen, 790 F.2d 1220, 1223 (5th Cir. 1986). Nevertheless, we must also be mindful that these individuals do not forfeit all their constitutional rights at the prison door. In particular, we must be vigilant with regard to pretrial detainees, who are presumed innocent and are incarcerated, in most instances, because of indigence and inability to pay a bond. It is significant in this case that both the Magistrate Judge and the District Court concluded, despite Vera Simmons' testimony, that Grabowski was a pretrial detainee at all times relevant to this action.

In deciding the legal standard for Grabowski's complaint, two lines of jurisprudence must be considered:  one recognizing a distinction between the rights of pretrial detainees and post-conviction prisoners generally; the other charting the evolution of the "deliberate indifference" standard in assessing the culpability of prison officials, and whether it applies in a condition of confinement other than a medical treatment context. These two tracks have at times paralleled and at times intersected, unfortunately not always with clarity and consistency.  We will review them in chronological order.

In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the United States Supreme Court for the first time extended the Eighth Amendment's prohibition against cruel and unusual punishment beyond conditions that are attached to the sentence itself[11]. A convicted prisoner filed a suit claiming he was subjected to cruel and unusual punishment with regard to treatment he received after an injury in the prison. The petition was dismissed by the district court for failure to state a claim. The Supreme Court observed that the Eighth Amendment prohibits punishments involving "the unnecessary and wanton infliction of pain." 97 S.Ct. at 290. The Court then held that "deliberate indifference to serious medical needs of prisoners" constitutes such an unnecessary and wanton infliction of pain[12].

In Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court faced a challenge to jail conditions lodged not by convicted prisoners but by pretrial detainees. the Court responded by establishing a clear distinction between the constitutional rights of the two groups. Persons already convicted of crimes and sentenced to prison are properly being punished. A challenge to the conditions of confinement is therefore measured against the Eighth Amendment's ban on cruel

---

[11]  Wilson v. Seiter, 111 S.Ct. 2321, 2323 (1991).

[12]  At the same time, the Court made clear that an accident or inadvertence or mere negligence does not trigger the Eighth Amendment. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." 97 S.Ct. at 292. See also Whitley v. Albers, 106 S.Ct. 1078 (1986).

20

and unusual punishment[13], as was done in Estelle.  Pretrial detainees, on the other hand, have not been found guilty of a crime and therefore cannot be punished while in custody.  To do so would punish them without due process of law.  At the same time, the high court noted that "(n)ot every disability imposed during pretrial detention amounts to `punishment' in the constitutional sense..."  99 S.Ct. at 1873.  Regulation and restraints on liberty necessary for the smooth running of the institution are not punishment.  The Supreme Court then articulated the test for a reviewing court dealing with a pretrial detainee.  Is the challenged condition or restriction "reasonably related to a legitimate governmental objective," such as maintaining order and security, or is it is arbitrary or purposeless or excessive, in which case it is prohibitive punishment?  99 S.Ct. at 1874.  Significantly, no mention was made of "deliberate indifference" which was an issue of importance in Estelle in evaluating Eighth Amendment complaints by convicted prisoners.

We recognized this distinction between convicted prisoners and pretrial detainees in the en banc decision of Jones v. Diamond, 636 F.2d 1364 (5th Cir. 1981)[14] and later in Alberti v. Klevenhagen, 790 F.2d 1220 (5th Cir. 1986).  In Alberti, inmates

_____

[13]  See, e.g. Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (challenging conditions in the Arkansas prison system)

[14]  Authored by Circuit Judge Alvin Rubin.

challenged conditions in the county jail as unconstitutional.

Their complaint was that inmate violence and sexual assault were

so rampant that the conditions violated the Eighth Amendment.

> While Eighth Amendment standards protect those inmates
> convicted of committing crimes, we note that the Harris
> County jails also house large numbers of inmates who
> are awaiting trial and have been unable to secure
> release.  The Due Process Clause of the Fourteenth
> Amendment accords state pretrial detainees rights not
> available to convicted inmates...  "Due process
> requires that a pretrial detainee not be punished.  A
> sentenced inmate, on the other hand, may be punished,
> although that punishment may not be `cruel and unusual'
> under the Eighth Amendment."  Wolfish, 441 U.S. at 535
> n. 16, 99 S.Ct. at 1872 n. 16, 60 L.Ed.2d at 466 n. 16.
> However, since incarceration necessarily imposes
> restrictions on pretrial detainees, such restrictions
> are valid, absent an intent to punish, if "reasonably
> related to a legitimate objective" rather than
> "arbitrary or purposeless."  Id.  441 U.S. at 539, 99
> S.Ct. at 1874, 60 L.Ed.2d at 468.

In Alberti, the district court had not expressly drawn this

distinction.  However, the district court found, as did we, that

the violence and sexual abuse were so widespread in the jail that

the conditions violated even the greater Eighth Amendment

standard against cruel and unusual punishment.  Necessarily then

the conditions were not "reasonably related to a legitimate

objective" but were rather "arbitrary or purposeless."  We also

noted the "constitutionally rooted duty of jailers to provide

their prisoners reasonable protection from injury at the hands of

fellow inmates..."  790 F.2d at 1224.


The same year as Alberti, we decided Johnston v. Lucas, 786

F.2d 1254 (5th Cir. 1986).  Petitioner Johnston was a convicted

prisoner who was stabbed by another inmate.  The various prison

22

officials had ample warning that Johnston was in danger from this particular inmate and had made efforts, ultimately unsuccessful, to keep them separated.  Using the Eighth Amendment as a guide and citing Estelle, we concluded that "deliberate indifference" was the appropriate standard to apply in denial of protection claims as well as denial of medical care.  Notable, of course, is that Johnston was a convicted inmate, not a pretrial detainee.

In Cupit v. Jones, 835 F.2d 82 (5th Cir. 19897), we affirmed the distinction between detainees and convicted prisoners and, in particular, rejected the "deliberate indifference" standard with respect to the detainees in the medical care context.  The petitioner was a pretrial detainee who alleged he was denied proper medical attention for his heart condition.  The magistrate recommended dismissal of the complaint, specifically finding that the petitioner failed to prove that the prison officials acted with "deliberate indifference" to his needs.  The district court granted summary judgment for the defendants.  On appeal, we highlighted the distinction between the two classes of inmates because "the due process clause of the fourteenth amendment accords pretrial detainees rights not enjoyed by convicted inmates under the eighth amendment prohibition against cruel and unusual punishment."  835 F.2d at 84.

> Today, we conclude that pretrial detainees are entitled to reasonable medical care unless the failure to supply that care is reasonably related to a legitimate governmental objective.  Furthermore, pretrial detainees are entitled to protection from adverse conditions of confinement created by prison officials

23

for a punitive purpose or with punitive intent. We
perceive this holding to be consistent with the
criterion for conditions imposed on pretrial detainees
set forth by the Supreme Court in Bell v. Wolfish. In
so holding, we recognize that the distinction as to
medical care due a pretrial detainee, as opposed to a
convicted inmate, may indeed be a distinction without a
difference, for if a prison official acted with
deliberate indifference to a convicted inmate's medical
needs, that same conduct would certainly violate a
pretrial detainee's constitutional rights to medical
care. However, we believe it is a distinction which
must be firmly and clearly established to guide
district courts in their evaluation of future cases
involving the constitutionality of all conditions
imposed upon pretrial detainees.

835 F.2d at 85. We concluded in Cupit that even though the

magistrate applied the wrong standard of "deliberate

indifference," the district court correctly dismissed the suit

because the evidence failed to show that Cupit was denied

reasonable medical care in the first place.

Thus, as of 1987, we had 5th Circuit precedent, in a condition of

confinement cases, acknowledging that pretrial detainees are

entitled to greater rights than convicted prisoners. Alberti.

We also had precedent holding that the "deliberate indifference"

standard was the proper standard to apply in the context of

convicted prisoners who claimed denial of medical care or the

failure to protect. Johnston. Finally, we had precedent that

"deliberate indifference" was not the proper standard to apply in

a denial of medical care case involving a pretrial detainee.

Cupit.

In Wilson v. Seiter, 111 S.Ct. 2321 (1991), the Supreme Court

24

revisited the "deliberate indifference" standard in connection with an Eighth Amendment challenge to prison conditions generally brought by a convicted inmate[15]. The Court divided an Eighth Amendment complaint into an objective component - was the deprivation sufficiently serious - and a subjective component - did the official act with a sufficiently culpable state of mind[16]. 111 S.Ct. at 2324. With respect to the subjective component, the Court extended the "deliberate indifference" standard, articulated in Estelle with regard to denial of medical care, to Eighth Amendment challenges of prison conditions generally. An inmate has to prove, at a minimum, that the prison official acted with "deliberate indifference" to the challenged deprivation. This, of course, is consistent with the conclusion reached earlier by our court in Johnston v. Lucas, infra.

In Williams v. County of El Paso, No. 91-8505, an unpublished decision, a pretrial detainee was stabbed by another inmate and claimed a denial of due process in the failure of the prison to protect him. The district court applied a "deliberate indifference" standard which the petitioner claimed on appeal was a more culpable state of mind than required. The Williams panel

---

[15] The petitioner complained of overcrowding, unsanitary restrooms and dining areas, inadequate heat, cooling, ventilation and inadequate housing for the physically and mentally ill.

[16] Since punishment, by definition, is a deliberate act intended to deter or chastise, the state of mind of a prison official is relevant in deciding whether he inflicted cruel and unusual "punishment." 111 S.Ct. at 2325.

discussed the caselaw distinguishing pretrial detainees from convicted prisoners generally. The panel cited <u>Alberti</u>. <u>Alberti</u> stated that pretrial detainees had greater rights than convicted prisoners but did not need to discuss the distinction in detail since the conditions of violence in the jail in <u>Alberti</u> were so severe that they violated the Eighth Amendment as well. The <u>Williams</u> panel also noted that we had formulated the less exacting standard of reasonableness with respect to denial of medical care. Nonetheless, the <u>Williams</u> panel then declared that "(u)ntil this court determines, however, that something less than deliberate indifference applies to pretrial detainees in the failure-to-protect context, deliberate indifference is the standard to be applied in this case." <u>Williams v. County of El Paso</u>, at p. 14. The panel overlooked the message of <u>Alberti</u>, in fact a failure-to-protect case, where we had chided the lower court for failing to draw the distinction between the rights of a convicted prisoner and those of a pretrial detainee. As this court has repeatedly held, one panel cannot overrule another panel, even if one disagrees with the decision. <u>Montesano v. Seafirst Commercial Corporation</u>, 818 F.2d 423 (5th Cir. 1987). <u>Williams</u>, therefore, must yield to <u>Alberti</u>.

In <u>Sodie v. Canulette</u>, No. 91-3620, an unpublished opinion issued shortly thereafter, a pretrial detainee was assaulted by a convicted prisoner and claimed his rights were violated because the jail personnel did not protect him. The <u>Sodie</u> panel stated

26

correctly that the standard for a failure-to-protect claim by a convicted prisoner is deliberate indifference. The panel then stated that our court "has refused to find a distinction between convicted inmates and pretrial detainees in a failure-to-protect context," citing <u>Alberti</u>. <u>Sodie</u>, at p. 5[17]. This was an unfortunate error. <u>Alberti</u> in fact made a point of drawing a distinction between the rights of pretrial detainees and convicted prisoners. <u>Alberti</u> found, under the facts of the case, that the conditions of violence and assault were so egregious that they violated the Eighth Amendment standard, which necessarily violated the lesser standard as well. Again, <u>Sodie</u> must yield to the prior precedent of <u>Alberti</u>.

In <u>Parker v. Carpenter</u>, 978 F.2d 190 (5th Cir. 1992), we were concerned with a pretrial detainee who alleged he was moved from a minimum security area in the jail to one housing violent inmates and that this was done in retaliation after an argument with a guard. Once transferred, the petitioner stated he was attacked by another inmate and lost his right eye[18]. The district court dismissed the petition for failure to state a claim. We reversed. We cited <u>Bell v. Wolfish</u> and <u>Cupit v. Jones</u> in holding that pretrial detainees cannot be subjected to conditions constituting punishment. An action or inaction

[17] We then applied the deliberate indifference standard and dismissed Sodie's claim.

[18] He also alleged that the jail staff was slow in coming to his aid and later was lax with his post-operative needs.

27

relating to a detainee _is_ punishment unless it reasonably relates to a legitimate government objective.  We specifically found that Parker "has plead that his transfer to the violent inmate section was an act of punishment which is a legal claim cognizable under a 1983 claim."  978 F.2d at 192.  "Deliberate indifference" was not mentioned[19].  This was a published decision, in accord with _Alberti_ and _Cupit_.

In _Banana v. McNeel_, No. 92-7184, a subsequent unpublished opinion, the petitioner claimed his rights were violated, in part, because of repeated assaults by other inmates while in custody[20].  The district court applied the "deliberate indifference" standard.  Citing, _Sodie_ and _Williams_, the _Banana_ panel declared that "deliberate indifference" is the appropriate standard in failure-to-protect cases.  Again, those decisions glossed over the distinction between pretrial detainees and convicted inmates, overlooked the prior precedent of _Alberti_ and likewise _Parker_.  _Banana_ also must yield to the earlier holdings.

We find the allegations and evidence in this case to be analogous to those made in _Parker v. Carpenter_.  In _Parker_, we remanded for

---

[19]  Recently the United States Supreme Court further defined the "deliberate indifference" standard with respect to Eighth Amendment claims.  _Farmer v. Brennan_, 114 S.Ct. 1970 (1994). that decision did not deal with a pretrial detainee.

[20]  The opinion does not state whether Banana was a pretrial detainee or a convicted prisoner.  The underlying record indicates he was a pretrial detainee.

28

adjudication on the merits, articulating the test to be whether Parker's transfer to a more violent unit was reasonably related to a legitimate government purpose or whether it was done as punishment or retaliation.  We cited Cupit v. Jones which rejected the "deliberate indifference" standard in considering medical claims of pretrial detainees.  We hold today that in all conditions of confinement actions, medically related or otherwise, it is not necessary for a pretrial detainee to establish that the official involved acted with "deliberate indifference" in order to establish a due process violation.  The test is whether the official action was reasonably related to a legitimate government purpose or whether it was done for the purpose of punishment or retaliation.

We therefore AFFIRM the District Court with respect to Grabowski's 28 U.S.C. §2254 petition for writ of habeas corpus. We also AFFIRM the District Court with respect to Grabowski's 42 U.S.C. §1983 complaint insofar as it related to the restriction of his visitation, telephone and recreation privileges.  We VACATE and REMAND the portion of the petitioner's §1983 complaint that related to his cell placement, as the District Court did not review the petitioner's claim under the appropriate standard.  On remand, the District Court should determine whether the placement of Grabowski in the particular cell was reasonably related to legitimate institutional objectives, or whether it was arbitrary or purposeless.

29

JERRY E. SMITH, Circuit Judge, concurring in part and dissenting in part:

I must respectfully but strongly disagree with today's resourceful and well-intentioned opinion, which abuses circuit precedent in a manner that I have not heretofore seen on this court. Judge Berrigan's reasoning reflects a misunderstanding of the manner in which we, as a common law court, apply and interpret our prior cases.

Specifically, Judge Berrigan attempts to change circuit law by declaring that several recent panels have misinterpreted prior precedent. This eviscerates our well-established rule that one panel cannot overrule another, even if the panel majority believes that earlier interpretations were in error. Concluding that such an approach counsels judicial anarchy, I dissent from that portion of the opinion that deals with Grabowski's cell assignment.

On the merits, Judge Berrigan's holding is contrary to the overwhelming weight of authority from other circuits in failure-to-protect cases involving pretrial detainees. In addition to announcing an erroneous standard, her opinion has the unintended consequence of rewarding racist conduct in prison. If this opinion were binding circuit law))which it most decidedly is not because it contravenes existing caselaw))a white racist could

ensure himself segregated housing in jail by doing what Grabowski indisputably did:  referring to a black legal assistant as a "nigger bitch" and threatening (apparently in reference to another inmate) to "cut that nigger's throat."

Moreover, Judge Berrigan's bold pronouncement is made in a routine case, without oral argument, and in which the plaintiff appears pro se.  At the very least, the court should review this matter en banc to ensure that if we are to announce so dramatic a shift in circuit law, we do so with forewarning and plenary deliberation and in a manner that adequately reconciles existing caselaw.

### I.

### A.

Before discussing the merits of the instant case, I will address the interpretive flaw in Judge Berrigan's opinion, for that aspect of the opinion has odious consequences far beyond the case at hand.  Heretofore, this circuit has carefully abided by the well-tested maxim that one panel of this court cannot overrule another, even if it disagrees with the prior panel's holding.  See, e.g., Texas Refrigeration Supply v. FDIC, 953 F.2d 975, 983 (5th Cir. 1992).  A "purpose of institutional orderliness" is served by "our insistence that, in the absence of intervening Supreme Court precedent, one panel cannot overturn another panel, regardless of how wrong the earlier panel decision may seem to be."  Montesano v. Seafirst Commercial Corp.,

818 F.2d 423, 425-26 (5th Cir. 1987).

That rule is usually applied where a panel has addressed a _res nova_ issue and announced a new rule of law. Once that has occurred, no subsequent panel may overrule the prior panel.

The case _sub judice_ presents a variation on that scenario. Several years ago, in the seminal case on this issue,[21] a panel made certain holdings but left some questions unanswered because their answer was not necessary to the disposition of the case. Subsequently, other panels have interpreted that case; those interpretations are holdings and constitute binding circuit precedent. They in no way overrule or undermine the seminal panel but merely fill in the gaps not specifically covered by that panel's analysis.

Now, Judge Berrigan has decided that three subsequent panels incorrectly interpreted the initial case.[22] She does not consider herself bound by the later panels, so she stoutly establishes her own line of authority. One could conclude that this is presumptuous; even if not, it is wholly unauthorized and contrary to our rule of orderliness.

This method of reasoning should not be allowed to stand. It permits any panel majority to undermine settled circuit law by declaring that an entire line of cases has "misinterpreted"

---

[21] That case is _Alberti v. Klevenhagen_, 790 F.2d 1220 (5th Cir. 1986), which I discuss at more length, _infra_.

[22] Specifically, in regard to the initial Fifth Circuit case, Judge Berrigan opines that one panel "overlooked [its] message"; a second panel's interpretation of it "was an unfortunate error"; and a third panel "overlooked the prior precedent."

32

earlier authority and therefore need not be followed.[23]

A recent example will show how this court has handled similar interpretive questions heretofore.  In <u>Elliott v. Perez</u>, 751 F.2d 1472, 1479 (5th Cir. 1985), we imposed the heightened pleading standard in 42 U.S.C. § 1983 cases.  <u>Elliott</u> involved <u>individual</u> defendants.  In <u>Palmer v. City of San Antonio</u>, 810 F.2d 514, 516-17 (5th Cir. 1987), however, a panel interpreted <u>Elliott</u> to apply to <u>municipal</u> defendants and, on the basis of <u>Elliott</u>, imposed the heightened pleading standard in suits against them, as well.

<u>Palmer</u>'s extension of <u>Elliott</u> to municipal defendants was questioned, but there is no doubt that subsequent panels considered themselves bound by it.  <u>See</u> <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 954 F.2d 1054, 1057 (5th Cir. 1992) (applying <u>Palmer</u> but complaining that "[t]he <u>Palmer</u> court did not explain why the heightened pleading requirement should be extended to defendant municipalities, considering that municipalities cannot claim the immunity defense"), <u>rev'd</u>, 113 S. Ct. 1160 (1993).  <u>Accord</u> <u>id.</u> at 1060-61 (Goldberg, J., concurring).

Importantly, there was no suggestion that panels after <u>Palmer</u> could simply declare that <u>Palmer</u> had misinterpreted <u>Elliott</u> and thus did not constitute binding circuit precedent.

---

[23] By Judge Berrigan's reasoning, any panel would be free, at any time, to override an entire line of interpretive jurisprudence by declaring that those panels had misinterpreted an earlier case from this court or the Supreme Court.  For example, all of this court's cases interpreting bedrock decisions such as <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), or <u>Boeing Co. v. Shipman</u>, 411 F.2d 365 (5th Cir. 1969) (en banc), could be undermined by this device.

Only when the Supreme Court decided Leatherman, rejecting the heightened pleading standard as to municipalities, was Palmer effectively overruled.[24]

B.

I will now show how these generalities apply to the instant case. As I have stated, the seminal case is Alberti v. Klevenhagen, 790 F.2d 1220 (5th Cir. 1986), in which, as Judge Berrigan observes, this court declared that the Due Process Clause "accords state pretrial detainees rights not available to convicted inmates." Id. at 1224. This was dictum, for Judge Berrigan correctly interprets Alberti to conclude that "the violence and sexual abuse were so widespread in the jail that the conditions violated even the greater Eighth Amendment standard against cruel and unusual punishment." As the higher Eighth Amendment standard was satisfied, there was no specific holding as to whether a different standard should be applied to the failure to protect pretrial detainees.

Judge Berrigan, however, now declares that three subsequent unanimous panels have misinterpreted Alberti in this respect. In

_____

[24] The point of this discussion is that a panel cannot overrule, or declare void, a prior panel's interpretation of earlier circuit caselaw, even if it appears flawed. Where the prior panel was aware of, discussed, and attempted to apply that caselaw, its interpretation itself becomes binding caselaw that can be overruled only by action of the en banc court or the Supreme Court.

More commonly, our rule of orderliness comes into play when two panels become "ships passing in the night." A subsequent panel may be unaware of an earlier holding and, consequently, may reach a contrary result. No interpretation is involved, as the later panel makes no mention of the earlier case. In such an instance, we can easily say that the later opinion is a nullity; any other rule would invite judicial chaos.

34

the failure-to-protect context for pretrial detainees, the first such case to interpret Alberti was Williams v. County of El Paso, 966 F.2d 675 (table), No. 91-8505 (5th Cir. June 3, 1992) (per curiam) (unpublished). There, the plaintiff, a pretrial detainee, alleged a Fourteenth Amendment violation from a stabbing incident in which he was permanently injured. A per curiam panel of Judges Jolly, Davis, and Smith applied the deliberate indifference standard, stating that that standard had been adopted by this circuit in Johnston v. Lucas, 786 F.2d 1254, 1259-60 (5th Cir. 1986). We specifically held that the mention of "reasonable protection" of prisoners in Stokes v. Delcambre, 710 F.2d 1120, 1124 (5th Cir. 1983), "was not meant to create a reasonableness standard in deciding whether the duty was violated." Williams, op. at 13.

Judge Berrigan correctly observes that Johnston is distinguishable from the instant case because Johnston involved a convicted inmate, not a pretrial detainee. The significance of Williams is that there, we discussed at length the issue presented here: whether the plaintiff's status as pretrial detainee or convicted prisoner is determinative. We acknowledged that in Bell v. Wolfish, 441 U.S. 520 (1979), upon which Judge Berrigan partly relies, "[t]he Supreme Court [drew] a distinction between convicted prisoners and pretrial detainees." Williams, op. at 13.

In Williams, we observed that "Stokes . . . did not discuss whether there is any difference between the rights enjoyed by

35

pretrial detainees and by convicted persons in the failure-to-protect context . . . ."  Williams, op. at 13-14.  We distinguished the denial-of-medical-care cases, in which "we have held that pretrial detainees are entitled to reasonable medical care unless the failure to supply it is reasonably related to a legitimate governmental objective."  Williams, op. at 14 (citing Jones v. Diamond, 636 F.2d 1364, 1378 (5th Cir. Jan. 1981) (en banc), cert. dismissed, 453 U.S. 950 (1981), overruled on other grounds, International Woodworkers of Am. v. Champion Int'l Corp., 790 F.2d 1174 (5th Cir. 1986) (en banc), aff'd, 482 U.S. 437 (1987); Cupit v. Jones, 835 F.2d 82, 85 (5th Cir. 1987)).

The Williams panel then addressed whether, in a failure-to-protect case, the same standard was to be applied to pretrial detainees as to prisoners.  The Williams court answered this question definitively in the affirmative.

First, the Williams panel noted that Stokes had not discussed the matter.  Williams, op. at 13.  Then, the Williams court described the import of Alberti as follows:  "Although [in Alberti] we recognized that Bell [v. Wolfish] established greater rights for pretrial detainees than for convicted persons, we did not attempt to formulate a different standard for pretrial detainees for a failure-to-protect claim."  Williams, op. at 14.  Citing with approval Redman v. County of San Diego, 942 F.2d 1435, 1442-43 (9th Cir. 1991), cert. denied, 112 S. Ct. 972 (1992), and Anderson v. Gutschenritter, 836 F.2d 346, 349 (7th Cir. 1988), we held as follows:  "Until this court

36

determines . . . that something less than deliberate indifference applies to pretrial detainees in the failure-to-protect context, <u>deliberate indifference is the standard to be applied in this case</u>." <u>Id.</u> (emphasis added).

Importantly, the <u>Williams</u> panel did not attempt to undermine <u>Alberti</u> but merely interpreted it. At that point, <u>Williams</u> became circuit law, binding on all subsequent panels, including the instant panel for which Judge Berrigan writes.

If there was any doubt that <u>Williams</u> had announced the standard to be applied, that uncertainty was erased two months later by <u>Sodie v. Canulette</u>, 973 F.2d 923 (table), No. 91-3620 (5th Cir. Aug. 13, 1992) (per curiam) (unpublished). In <u>Sodie</u>, the plaintiff, also a pretrial detainee, claimed his constitutional rights were violated when prison officials failed to protect him from attack at the hands of another inmate. Significantly, the per curiam panel (Judges King, Davis, and Wiener) reasoned as follows:

> Our standard for a failure-to-protect claim brought by a convicted inmate is deliberate indifference. <u>Johnson v. Lucas</u>, 786 F.2d 1254, 1259-60 (5th Cir. 1986). <u>This court has refused to find a distinction between convicted inmates and pretrial detainees in a failure-to-protect context.</u> <u>Alberti v. Klevenhagen</u>, 790 F.2d 1220, 1224 (5th Cir. 1986). . . . We therefore apply the deliberate indifference standard here.

<u>Sodie</u>, op. at 5-6 (emphasis added). We cited, with approval, <u>Whitley v. Albers</u>, 475 U.S. 312, 327 (1986), and <u>Redman</u> and <u>Anderson</u>, constituting caselaw from two other circuits applying the deliberate indifference standard to pretrial detainees in the failure-to-protect context.

37

It is significant that <u>Sodie</u> mentions <u>Alberti</u> and plainly relies upon and interprets it.  A year later, <u>Sodie</u> and <u>Williams</u> were cited and followed in <u>Banana v. McNeel</u>, 5 F.3d 1495 (table), No. 92-7184 (5th Cir. Sept. 22, 1993) (unpublished).  There, the plaintiff, a pretrial detainee, claimed Fourteenth Amendment violations based upon the alleged failure of jail officials to protect him from assaults from other inmates.  The panel (Judges Garwood, Davis, and Smith) applied the deliberate indifference standard and stated that it is "required under <u>Wilson v. Seiter</u>, 111 S. Ct. 2321, 2324 (1991)."  <u>Banana</u>, op. at 2 (footnote omitted).  In <u>Banana</u>, importantly, we noted that in <u>Sodie</u> and <u>Williams</u>, we had held that in failure-to-protect cases, a court must apply a deliberate indifference test.

Judge Berrigan avoids the first post-<u>Alberti</u> case))<u>Williams</u>))by stating that the <u>Williams</u> "panel overlooked the message of <u>Alberti</u>."  But this is just another way of saying that Judge Berrigan disagrees with the <u>Williams</u> panel's <u>interpretation</u> of <u>Alberti</u>.

Judge Berrigan certainly has the right to express her disagreement with the way in which the post-<u>Alberti</u> jurisprudence has developed))much as the <u>Leatherman</u> panel expressed discomfort with <u>Palmer</u>'s interpretation of <u>Elliott</u>.  But in accordance with our rule of orderliness, Judge Berrigan cannot overrule <u>Williams</u> or its progeny, <u>Sodie</u> and <u>Banana</u>, merely by declaring that those panels of this court misunderstood and misapplied prior circuit

38

law.[25]

Although Judge Berrigan discards <u>Williams</u>, <u>Sodie</u>, and <u>Banana</u>, she relies upon the contrary precedent of <u>Parker v. Carpenter</u>, 978 F.2d 190 (5th Cir. Nov. 20, 1992), decided three months after <u>Sodie</u> and about a year before <u>Banana</u>. In <u>Parker</u>, a pretrial detainee alleged that he was improperly moved to a dangerous cell and that once injured, he was denied proper medical care. In an opinion by Judge Thornberry (joined by Judges Higginbotham and Barksdale), the panel, without mentioning or considering the deliberate indifference standard, stated that the test for both claims was whether the state action was "reasonably related to a legitimate governmental objective." <u>Id.</u> at 192.

The <u>Parker</u> panel was correct in its test for medical care, based upon <u>Cupit v. Jones</u>, 835 F.2d 82, 85 (5th Cir. 1987), upon which it relied. In the failure-to-protect context, however, that panel was without authority to overrule (<u>sub silentio</u>) <u>Williams</u> and <u>Sodie</u>, of which the <u>Parker</u> panel presumably was unaware.[26]

The instant panel is bound by <u>Williams</u> and <u>Sodie</u>, not by

---

[25] The same reasoning applies to Judge Berrigan's attempt to avoid <u>Sodie</u> by declaring that its interpretation of <u>Alberti</u> "was an unfortunate error." Similarly, Judge Berrigan accuses the <u>Banana</u> panel of "overlook[ing] the prior precedent of <u>Alberti</u>." While <u>Banana</u> does not cite <u>Alberti</u>, it relies squarely upon <u>Sodie</u> and <u>Williams</u>, both of which expressly interpret and apply <u>Alberti</u>.

[26] This is a good example of "ships passing in the night." <u>See</u> <u>supra</u> note 4. The <u>Parker</u> panel made no effort to interpret or reconcile <u>Williams</u> or <u>Sodie</u> for the good reason that, evidently, it did not know of their existence. Nor does <u>Parker</u> even mention <u>Alberti</u>. Plainly, <u>Parker</u> cannot prevail in the wake of these prior cases, and Judge Berrigan's attempt to rely upon it is misguided.

<u>Parker</u>, because in the event of two conflicting precedents, the prior opinion controls. <u>Smith v. Penrod Drilling Corp.</u>, 960 F.2d 456, 459 n.2 (5th Cir. 1992). By this rule, <u>Banana</u> also correctly reflects the law of this circuit in the failure-to-protect context by its adherence to <u>Williams</u> and <u>Sodie</u>.[27]

Accordingly, Judge Berrigan misunderstands the manner in which this court interprets and applies its existing precedent. Her opinion is not the law of this circuit, as she has no authority to overrule this court's well-established precedents, <u>Williams</u>, <u>Sodie</u>, and <u>Banana</u>.


II.

Judge Berrigan's opinion is also notable in that it makes no mention of the law in other circuits. Significantly, the overwhelming weight of authority among the circuits is to the effect that the deliberate indifference standard applies to pretrial detainees. <u>See</u> <u>Anderson v. County of Kern</u>, 1995 U.S. App. LEXIS 544, at *3 (9th Cir. Jan. 13, 1995) (citing <u>Redman v. County of San Diego</u>, 942 F.2d 1435, 1442-43 (9th Cir. 1991) (en banc) (failure to protect pretrial detainee from rape), <u>cert. denied</u>, 112 S. Ct. 972 (1992)) (placement of suicidal and mentally disturbed pretrial detainees in safety cells); <u>Hill v. Dekalb Regional Youth Detention Ctr.</u>, 40 F.3d 1176, 1185-94 (11th Cir. 1994) (complaint by juvenile detainee regarding medical care

---

[27] It goes without saying that the <u>Banana</u> panel was not bound by <u>Parker</u>, which, as I have explained, is not circuit precedent because it directly contravenes the earlier precedent established by <u>Williams</u> and <u>Sodie</u>.

and protection from sexual assault); Howard v. Dickerson, 34 F.3d 978, 980 (10th Cir. 1994) (medical care); Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994) (deliberate indifference standard applied to all conditions-of-confinement cases); Massey v. Rufo, 14 F.3d 44 (table), 1994 U.S. App. LEXIS 6202, at *2 n.1 (1st Cir. Jan. 14, 1994) (per curiam) (unpublished) (citing Bell v. Wolfish, 441 U.S. at 535 n.16; Elliott v. Cheshire County, 940 F.2d 7, 10 & n.2 (1st Cir. 1991) (medical care)); Kost v. Kozakiewicz, 1 F.3d 176, 188 (3d Cir. 1993) (nonmedical conditions of confinement); Gray v. Farley, 13 F.3d 142, 146 (4th Cir. 1993) (medical care); Anderson v. Gutschenritter, 836 F.2d 346, 348-49 (7th Cir. 1988) (failure to protect pretrial detainee from assaults from other inmates); Molton v. City of Cleveland, 839 F.2d 240, 243 (6th Cir. 1988) (medical care), cert. denied, 489 U.S. 1068 (1989).

No other circuit has come close to the sweeping statement Judge Berrigan makes today:  that "in all conditions of confinement actions, medically related or otherwise, . . . [t]he test is whether the official action was reasonably related to a legitimate government purpose . . . ."  To that extent, Judge Berrigan unnecessarily creates a circuit split by authoring an opinion at odds with the well-reasoned views of the above-cited courts of appeals.

### III.

Finally, I must comment on the factual substance of the

present case.  Grabowski is, apparently, an avowed white racist. He claims the Constitution was violated when he was assigned to a cell with black inmates.  In her opinion for the panel majority, Judge Berrigan expresses no cognizance of the extremely sensitive and volatile nature of this dispute.

Grabowski claims he was assigned to be housed with blacks because he was known to have engaged in racially derogatory outbursts and threats.  We must be careful not to define the law in such a way that Grabowski and others can ensure themselves of racially segregated prison living simply by exhibiting racism openly and in such a way that they voluntarily expose themselves to physical danger at the hands of other inmates.

Judge Berrigan imposes the "reasonable governmental objective" standard regarding the decision to put Grabowski in integrated living conditions.  But requiring such a showing is wholly unreasonable, as pretrial detainees are transferred as part of legitimate, day-to-day prison operations.  In <u>Bell</u>, 441 U.S. at 539 n.20, the Court indicated that state officials do not have to justify facially legitimate prison measures absent a showing of punitive intent.  This is precisely what Judge Berrigan's opinion does, however.

Moreover, it seems, intuitively, that racially integrated housing should be the presumption, and segregation the rare exception.  Instead, Judge Berrigan's opinion treats this sensitive issue as benignly as we normally would treat routine conditions of confinement such as the temperature of the cells or

the taste of the food.  In so doing, Judge Berrigan fails to address the problems that can be created by enunciating a standard that could well result in an increase in segregated conditions in our prisons and jails.

IV.

In summary, the standard that Judge Berrigan attempts to announce today is substantively unwise and, more importantly, contravenes established Fifth Circuit law.  Accordingly, that standard most decidedly is not the binding law of this circuit, though if it is not overruled en banc it certainly will be cited, by other plaintiffs in Grabowski's circumstance, as the law of the circuit, thus leading to confusion in this court's jurisprudence.  Despite Judge Berrigan's diligent and heartfelt efforts, I must conclude that her holding is unauthorized and imprudent, and accordingly, I respectfully dissent.